IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNION STANDARD INSURANCE
COMPANY, a foreign corporation,

        Plaintiff,

vs.                                            No. 03-CV-0727 JCH/RHS

HOBBS RENTAL CORPORATION, and
ST. PAUL GUARDIAN INSURANCE COMPANY,
a foreign insurer

        Defendants.


**AMENDED[1] MEMORANDUM OPINION AND ORDER**

      **THIS MATTER** comes before the Court on Defendant Hobbs Rental Corporation's

("HRC") Motion for Summary Judgment, filed December 29, 2005 **[Doc. No. 173]**, Plaintiff

Union Standard Insurance Company's ("Union Standard") Motion for Summary Judgment, filed

---

[1]  The Court files this Amended Memorandum Opinion and Order ("Amended Order") to correct certain typographical errors and to clarify certain of the Court's rulings.  The Court issues this Amended Order in accordance with Rule 60(a) of the Federal Rules of Civil Procedure.  The Court notes that this Amended Order contains no substantive change in the Court's ruling. Specifically, the Court corrects and/or clarifies the following:  (1) in the first and second lines of page 21 of its original Memorandum Opinion and Order ("Original Order"), the Court clarifies its holding by changing both occurrences of "covered auto" to "non-owned auto," (2) in the second line of the first full paragraph on page 27 of its Original Order, the Court omits the word "even," replaces "Union Standard's" with "HRC's," and inserts other clarifying language, (3) in the final line of page 27 of its Original Order, the Court omits "does not" and changes "constitute" to "constitutes," (4) in the second line of the first full paragraph on page 32 of its Original Order, the Court clarifies its holding by omitting "a 'covered auto'" and substituting "is not 'mobile equipment,'" (5) in the sixth line of the first full paragraph on page 32 of its Original Order, the Court adds "does not" and changes "constitutes" to "constitute," and (6) on pages 46 and 47 of the conclusion section of its Original Order, the Court clarifies its rulings with respect to whether the Nolan Brunson vehicle constitutes a "non-owned auto," "hired auto," and "mobile equipment."

January 13, 2006 **[Doc. No. 181]**, Plaintiff Union Standard's Motion for Summary Judgment

Against St. Paul Guardian Insurance Company ("St. Paul"), filed January 13, 2006 **[Doc. No.**

**183]**, Defendant HRC's Motion for Order to Prohibit the Testimony of Joseph J. Launie, PhD,

CPCU, FACFE based upon *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, filed December 30,

2005 **[Doc. No. 176]**, and Plaintiff Union Standard's Motion to Strike Testimony of Garth H.

Allen, filed January 13, 2006 **[Doc. No. 182]**.  The Court having considered the motions, briefs,

and relevant law, and being otherwise fully informed, finds that Defendant HRC's Motion for

Summary Judgment is well taken in part and granted in part, Plaintiff Union Standard's Motion

for Summary Judgment is not well taken and is denied.  Plaintiff Union Standard's Motion for

Summary Judgment Against St. Paul is denied as moot, Defendant HRC's Motion for Order to

Prohibit the Testimony of Joseph J. Launie, PhD is granted, and Plaintiff Union Standard's

Motion to Strike Testimony of Garth H. Allen is granted.

## BACKGROUND[2]

I.   <u>Underlying Lawsuit</u>.

On January 25, 2002, Wayne Widman *et al.* filed a lawsuit against HRC in the First

Judicial District, County of Santa Fe, Cause No. D-0101-CV-2002-00177 ("underlying lawsuit").

The complaint in the underlying lawsuit was amended on July 26, 2002 ("underlying complaint").

HRC is a business that leases equipment for use primarily in the oil industry.  Mr. Widman

was an employee of Nolan Brunson, Inc. ("Nolan Brunson" or "Brunson"), a company engaged in

the business of transporting and hauling oilfield equipment for companies such as HRC.  At the

---

[2] The following facts are undisputed, unless noted otherwise.

time of the injury precipitating the underlying complaint, HRC hired Nolan Brunson to load, transport, return, and unload a mud separator rented by a third-party oil company.  Nolan Brunson was an independent contractor of HRC.  At the time of the incident, HRC and Nolan Brunson were separate entities.  They did not share employees, were not partners, were not engaged in a joint venture, did not share common shareholders, directors or officers, and did not have any corporate or other business relationship.  Nolan Brunson billed HRC by the hour for the job.  The bill did not contain a specific amount for any "lease" or "hire" of the Brunson vehicle, and Mr. Brunson testified that HRC did not lease, borrow, or rent the Brunson vehicle.

The underlying complaint alleges that on May 13, 2000, Mr. Widman was "performing work for his employer on behalf and at the direction of HRC at HRC's industrial yard . . . that involved . . . returning a 'mud separator' to the HRC industrial yard."  "During the work being performed by Mr. Widman, the boom on the w[i]nch truck that was being used to lift the 'mud separator' so as to place it on the concrete slab where HRC stored such separators, came into contact with [a] high voltage electrical line, causing the electrical current to travel down the boom, through the separator and into [Mr.] Widman's body, which in turn electrocuted [him], causing him to suffer severe burns and other injuries to his body."

At the time of Mr. Widman's injuries, the mud separator was hanging from a boom called a gin pole, attached to the back of a "winch truck" owned and maintained by Brunson.  The truck itself is a 1998 International and was not designed or sold for the purpose of loading and unloading objects with a winch or a gin pole.  Rather, Nolan Brunson contracted out to another entity for application of the gin pole and the winch.  The "gin pole" was an affixed, mechanically

operated 33 foot pole used in lieu of a forklift or crane to load and unload heavy equipment.  It is disputed whether the gin pole was permanently affixed to the truck or removable.  Mr. Brunson testified that the winch and the gin pole were welded and bolted onto the truck.  He further testified that the winch and gin pole could be removed, but that Nolan Brunson did so only for repair.   The truck is fully licensed with the state of New Mexico to travel on highways and roadways.  Mr. Brunson testified that the normal distance the truck would travel to pick up or drop off equipment and crew was anywhere from between one to 200 miles.

Just prior to the injury, a three-person Nolan Brunson crew, consisting of Mr. Widman, Mr. Oona, and Mr. Garcia, dropped the trailer containing the mud separator in the middle of the HRC equipment yard.  In order to unload the mud separator, the truck was repositioned in order to utilize its gin pole and winch.  The chains fastening the mud separator to the trailer were then removed, the mud separator was then chained on both ends, and the chain was then connected to the winch line.  The gin pole and winch lifted the mud separator at chest high level to clear the separator from the trailer.  Once cleared from the trailer, the gin pole and winch then lowered the separator to knee high level.  Mr. Widman and Mr. Oona held the mud separator steady on opposite sides to keep it from twisting.  Mr. Oona then went to the area where the mud separator was to be placed, cleared the area of loose boards, and guided the truck.  Mr. Garcia drove the truck in reverse with the mud separator hanging from the gin pole and winch.  The gin pole was at a 75 to 80 degree angle while the truck was backing up, prepared to unload the mud separator.  Mr. Widman continued to hold the mud separator in place, while the truck was backing up, and was still doing so when the accident at issue occurred, *i.e.*, when the gin pole on the truck either

-4-

touched or came into close proximity with the overhead power line.

Mr. Widman's underlying complaint sets forth three causes of action.  For his second cause of action entitled "Negligence and Negligence Per Se," Mr. Widman contends in part that HRC failed to provide a safe working environment, warnings, and an appropriately safe work place for employees of Nolan Brunson performing work in the industrial yard of HRC, including Robert Widman.  For his third cause of action entitled "Additional Negligence of Hobbs Rental Corporation," Mr. Widman contends that HRC had a duty to "oversee[] and directly  supervis[e] the work being performed, and/or supervis[e] the work being performed on its property, and or protect[] workers on HRC's premises from high voltage lines, and/or insulat[e], relocat[e] or remov[e] the high voltage lines, and/or provid[e] a safe working environment."  Mr. Widman also maintains that HRC breached this duty by failing to hire and train experienced and/or adequate personnel to oversee work, failing to assure that adequate safety measures and precautions were taken and that they were in force and followed in conjunction with work being performed, failing adequately to train personnel it hired to oversee work in question, negligently storing separators in question directly under inherently dangerous power lines where it was readily foreseeable that a worker moving or handling separators could come into contact with the power line, failing to provide a safe working environment and work place for employees of Nolan Brunson, including Mr. Widman, and failing to exercise ordinary care in protecting individuals from the high voltage electrical lines and/or in insulating, removing, and/or relocating the lines.

At the time of Mr. Widman's injury, Nolan Brunson had a company-wide policy of conducting on-site tailgate safety meetings before each job commenced.  The tailgate safety

meetings included checking for overhead power lines.  In addition, Nolan Brunson employees are expected to and do carry out their own hazard assessment of any particular job site.

Evidence indicates that the Brunson vehicle was used to load and unload equipment via its gin pole.  Evidence also indicates that it was used to transport equipment, to pull a trailer hauling equipment, and to transport Nolan Brunson crew.  Mr. Brunson testified that the primary purpose of using the vehicle was to load and unload equipment via the gin pole.  Mr. Brunson also testified that the normal and usual use of the gin pole truck was to "load, transport, and unload equipment, that the vehicle was used to transport crew and equipment, and that on May 13, 2000, the Brunson truck was being used to transport a mud separator to the oil field and then take a mud separator back to HRC.

It is disputed whether HRC had control over the loading and unloading process.  Mr. Brunson testified that HRC told Nolan Brunson to place the mud separator on the north side of the HRC yard.  Mr. Widman's answers in the underlying lawsuit to written interrogatories indicate that:

> it is Plaintiff's belief that Hobbs Rental Corporation directed and required individuals and/or entitles storing mud separators on its property to place them on a concrete pad directly under the high voltage electrical distribution line in question despite the fact that Hobbs Rental Corporation knew or should have known that heavy equipment and equipment with booms would be needed to transport the mud separators.  As such, it is Plaintiff's belief that Hobbs Rental Corporation knew or should have known that individual and equipment would be in close proximity to the high voltage electrical distribution line yet took no measures to protect individuals from the danger posed by that line.
>
> . . . In addition, Plaintiff would state in order to clarify his previous answer that it is his belief that Hobbs Rental Corporation directed

and required individuals and/or entities storing or transporting mud separators on its property to place them on a concrete pad directly under the Oxy high voltage electrical distribution line.  It is Plaintiff's belief that Hobbs Rental Corporation acted in this manner despite the fact that they knew or should have known that trucks and heavy equipment, including those with gin poles would be used to load, unload and transport the mud separators, and that the use of such trucks and heavy equipment would put them in close proximity to the Oxy high voltage electrical line.  Despite the foregoing, Hobbs Rental Corporation took no action to inform, warn, or otherwise protect individuals using such heave equipment and trucks in the loading and unloading and transportation of the mud separators of the danger posed by the Oxy high voltage electrical line.

In addition, Mr. Brunson testified that it was his understanding that HRC instructed his crew to place the mud separator on the north side of the HRC yard.  Mr. Brunson further testified that if HRC had not told Nolan Brunson where to place the mud separator, Nolan Brunson would have asked.  Bobby Brown also testified that he spoke with Mr. Widman on the morning of the incident.  Mr. Johnny D. Cope, operator and manager of HRC, testified that "at some point . . . [HRC had] to instruct [Nolan Brunson] to do the work."

In contrast, Union Standard maintains that the facts in Mr. Widman's interrogatory response are disputed.  Union Standard cites to the testimony of Mr. Cope, in which he states that supervision or oversight of Nolan Brunson is not a standard procedure and that Nolan Brunson "pretty well manage[d] themselves."  Union Standard also cites to testimony of Mr. Brown, in which he states HRC did not control the details of Nolan Brunson's work.  Mr. Brunson testified that he was told no HRC personnel were on site (although he also testified that he did not have personal knowledge of this fact).  No HRC personnel handled or operated the Brunson vehicle. Nolan Brunson would not allow HRC to operate its equipment

No evidence of any expert opinion obtained in the underlying lawsuit places any negligence or wrongdoing on HRC for Mr. Widman's injuries.

II.      Insurance Policies.

      A.         The Union Standard and Reliance Policies.

Union Standard issued to HRC a commercial lines (Business Auto, or BA) policy effective from June 30, 1999, through June 30, 2000.  The policy was issued through Leavell Insurance Agency, an independent insurance agent.  The BA policy covered HRC for claims concerning automobiles or ownership or use of automobiles.

The Union Standard policy provides, "We will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'"

The Union Standard insurance policy defines "auto" as "a land motor vehicle, trailer, or semi-trailer designed for travel on public roads but does not include 'mobile equipment.'" "Mobile equipment" is defined as "vehicles . . . whether self-propelled or not, maintained primarily to provide mobility to permanently mounted: (A) Power cranes, shovels or loaders . . . ."

The Union Standard policy contains an exclusion which excludes coverage for "bodily injury . . . resulting from movement of property by a mechanical device (other than a hand truck) unless the device is attached to the covered "auto."

The Union Standard policy describes a "covered auto," as "any auto," found in the liability coverage keys symbol "1."  This includes coverage for autos which are owned, hired, borrowed

or non-owned autos.  HRC admits that Symbol "1" is the sum of coverages for Symbols "2" (owned autos), "8" (hired autos), and "9" (non-owned vehicles).

"Hired autos" are defined as "those autos you lease, hire, rent or borrow . . . ."  "Non-owned" autos are defined as "those autos you do not own, lease, hire, rent or borrow that are used in connection with your business."

        B.      <u>Reliance</u>.

HRC also had a commercial general liability (CGL) policy in effect at the time of the injury through Reliance Insurance Company.  Like the Union Standard policy, the Reliance policy also was issued through Leavell Insurance Agency.  The Reliance CGL policy covered HRC for claims for premises and products liability.

The Reliance CGL policy provides, "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' to which this insurance applies . . . . The bodily injury must be caused by an 'occurrence.'"  The Reliance policy excludes coverage for "bodily injury . . . arising out of the ownership, maintenance, use or entrustment to others of any 'auto.'"  Further, the Reliance policy defines "auto" as "a land motor vehicle . . . but 'auto' does not include 'mobile equipment.'"

        C.      <u>St. Paul</u>.

At the time of the accident, Nolan Brunson had a BA policy issued by St. Paul that provided coverage for bodily injury that "any protected person is legally required to pay as damages . . . . that . . . results from the ownership, maintenance, use, loading or unloading of a covered auto; and . . . is caused by an accident that happens while this agreement is in effect."

The St. Paul policy defines "protected person" as "[a]ny permitted user," which includes "[a]ny person or organization to whom you've given permission to use a covered auto you own, rent, lease, hire or borrow."

The Nolan Brunson truck at issue was insured under the St. Paul policy as a specifically scheduled auto.

III.     Defense of the Underlying Litigation.

         A.     Union Standard.

On May 18, 2000, five days after Mr. Widman was injured, HRC provided Leavell Insurance, Inc., the statutory and contractual agent of Union Standard, with a Notice of Occurrence/Claim indicating that Mr. Widman had been electrocuted on HRC's premises while doing work for his employer Nolan Brunson.

In February 2002, HRC provided Leavell with a copy of the underlying complaint filed by Mr. Widman on January 25, 2002.  HRC defended the underlying complaint from January 25, 2002, through Union Standard's assumption of a defense in June 2003.  HRC incurred $43,290.66 in costs.

On April 8, 2003, HRC, through its counsel, filed a demand for defense and indemnification against Union Standard, and not its agent.  HRC provided Union Standard with a copy of the summons and underlying complaint.  Union Standard responded to this demand by letter dated June 13, 2003, agreeing to defend, and counsel selected by Union Standard to defend HRC entered an appearance on June 19, 2003.

Union Standard filed the complaint in this insurance coverage litigation against HRC on

June 18, 2003, which was amended on July 26, 2003.  Thereafter, on June 23, 2003, Union

Standard issued a reservation of rights letter to HRC.

The letter from Union Standard indicates (1) that it was tendering a defense with a "full

reservation of" rights, (2) that it was reserving its rights "as described [in the letter] but without

limiting its right to assert additional grounds for reservation of rights," (3) that it was the position

of Union Standard that with respect to coverage the underlying claims for bodily injury "were not

the result of ownership, maintenance or use of a covered auto," and (4) that other exclusions,

including the exclusion related to "movement of property by mechanical device" and the exclusion

applying to bodily injury "arising out of the operation of any . . . 'mobile equipment,'" apply to

bar coverage.

In the course of its defense of HRC in the underlying suit, Union Standard incurred

defense costs and attorneys' fees which it paid on behalf of HRC in the amount of $116,992.62,

as well as indemnification costs of $500,000.00 for a payment to the underlying plaintiff on behalf

of HRC to settle the underlying suit.  These payments were made without prejudice and under a

reservation of rights.

B.     Reliance.

After HRC was served with the underlying lawsuit, Mr. Leavell tendered the defense to

Reliance, which defended under the CGL policy.  Mr. Leavell put Reliance on notice of the claim

because he believed that its CGL policy covered the loss.

Reliance became insolvent on or about March 15, 2002.  Following this insolvency, Mr.

Leavell placed its errors and omissions carrier, Employers Reinsurance Company, on notice of a

potential claim against the agency.

HRC separately sued the Leavell Agency on the grounds that Leavell negligently placed HRC "with a non-admitted company that went bankrupt."

## STANDARD

I.    <u>Summary Judgment</u>.

Summary judgment generally is appropriate when a court determines that "'there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law.'" *Thrasher v. B & B Chem. Co.*, 2 F.3d 995, 996 (10th Cir. 1993) (citation omitted).  Under Rule 56(c), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

To carry its initial burden, the moving party need not negate the nonmoving party's claim. *See Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997).  "'Instead, the movant only bears the initial burden of 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  A plaintiff cannot rely

upon conclusory allegations or contentions of counsel to defeat summary judgment but rather must produce some specific factual support of its claim.  *See Pueblo v. Neighborhood Health Centers, Inc.*, 847 F.2d 642, 649 (10th Cir. 1988); *Fritzsche v. Albuquerque Municipal Sch. Dist.*, 194 F. Supp. 2d 1194, 1206 (D.N.M. 2002).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Upon a motion for summary judgment, a court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co.*, 985 F. Supp 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998).  If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law. *See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

II.     Interpretation of Insurance Contracts.

        New Mexico case law indicates that insurance contracts should be construed in the same manner as other contracts.  *Rummel v. Lexington Ins. Co.*, 123 N.M. 752, 758, 945 P.2d 970, 976 (N.M. 1997).  The obligation of an insurer shall be determined by the terms of the policy at issue. *Miller v. Monumental Life Ins. Co.*, 376 F. Supp. 2d 1238, 1245 (D.N.M. 2005).  The insurance contract will be reviewed as a whole, starting with the language of the agreement itself.  *Rummel*, 123 N.M. at 758, 945 P.2d at 976.  The traditional rules of presentation, syntax, and grammar should be employed in the normal course of interpretation.  *Id.*

        Whether a policy is reasonably susceptible to different interpretations is a question of law

to be determined by the court. *C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 509, 817 P.2d 238, 243 (N.M.1991).  An ambiguity is not established simply because the parties disagree on the proper interpretation. *Trujillo v. CS Cattle Co.*, 109 N.M. 705, 709, 790 P.2d 502, 506 (1990).  Reasonableness is the touchstone for determining whether there is a true lack of clarity.  *Id.*

When evaluating competing interpretations of a policy to determine whether an ambiguity exists, the courts should view the language issue from the standpoint of "a hypothetical reasonable insured." *Berry v. Fed. Kemper Life Assurance Co.*, 136 N.M. 454, 471, 99 P.3d 1166, 1183 (N.M. Ct. App. 2004); *Computer Corner, Inc. v. Fireman's Fund Ins. Co.*, 132 N.M. 264, 266, 46 P.3d 1264, 1266 (N.M. Ct. App. 2002).  "Thus, the question the court should ask itself initially is what understanding a reasonably intelligent, non-lawyer lay person might glean from the policy, in light of the usual meaning of the words and the circumstances leading to purchase of the policy." *Berry*, 136 N.M. at 471, 99 P.3d at 1183 (citation omitted).  "Specialized knowledge of the insurance industry case law, academic treatments, and industry norms or standards should not enter into the inquiry." *Id.* (citation omitted).

Confronted with assertions of conflicting interpretations, the court should look first to the language itself.  If the language is plain enough "that no reasonable person could hold any way but one," then no ambiguity exists and "the court may interpret the meaning as a matter of law." *Id.* (citing *Mark V, Inc. v. Mellekas*, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993)).  Stated differently, if a policy is clear and unambiguous, a court does not construe the terms of the policy; instead, it applies the terms in their usual and ordinary meaning. *Miller*, 376 F. Supp. 2d at 1245.

-14-

Absent such clarity, or in aid of the basic inquiry as to whether there is a reasonable conflict in interpretation, courts may accept extrinsic evidence of the circumstances surrounding entry into the agreement. *Berry*, 136 N.M. at 471, 99 P.3d at 1183. "If the parties do not offer extrinsic evidence probative of the issue, the court may proceed to resolve the conflict as a matter of law." *Id.* at 472, 99 P.3d at 1184 (citing *Mark V, Inc.*, 114 N.M. at 782, 845 P.2d 1236). "[I]f [a court is] alerted to an interpretation supporting coverage to which the language of the policy is reasonably susceptible and which does not violate public policy, [the court] generally will construe the provision against the insurer and in favor of coverage." *Computer Corner*, 32 N.M. at 267, 46 P.3d at 1267, *cited in Berry*, 136 N.M. at 472, 99 P.3d at 1184. This "reasonable expectations" doctrine does not apply, however, where the insuring clause or exclusionary provision is conspicuous, clear, and unequivocal. *Pirkheim v. First UNUM Life Ins. Co.*, 229 F.3d 1008, 1011 (10th Cir. 2000) (citations omitted).

III.   Duty to Defend and Indemnify.

Under New Mexico law, an insurer's duty to defend an insured is judged by whether the factual allegations of the underlying complaint arguably or potentially fall within the scope of coverage. *See, e.g.*, *Am. Gen. Fire & Cas. Co. v. Progressive Cas. Co.*, 110 N.M. 741, 744, 799 P.2d 1113 (N.M. 1990). Even if the facts alleged in the underlying complaint are not clear, an insurer has a duty to defend if the allegations "simply tend to show an occurrence within the coverage." *Sena v. Travelers Ins. Co.*, 801 F. Supp. 471, 473 (D.N.M. 1992) (citations omitted).

An insurer's duty to indemnify is more narrow than its duty to defend. An insurer has the duty to indemnify when an injury falls within the scope of the insurance coverage.

## DISCUSSION

HRC and Union Standard cross-move for summary judgment on the issue whether Union Standard is obligated to defend and indemnify HRC in the underlying lawsuit.  The motions require the Court to determine (1) whether the Nolan Brunson vehicle was a "covered auto" under the Union Standard policy or whether the vehicle constituted "mobile equipment," (2) whether the injury arose out of the "use" of the Nolan Brunson vehicle, (3) whether the bodily injury "resulted from" the use of the vehicle, (4) whether the allegations of the underlying complaint trigger comprehensive general liability coverage instead of business auto coverage, (5) whether Union Standard waived its right to assert certain policy defenses, and (6) whether the parties are entitled to reimbursement of defense and/or indemnification costs.

In the event the Court finds coverage under the Union Standard policy, Union Standard moves this Court for summary judgment on its claim that St. Paul has a duty to defend and indemnify HRC.  This motion for summary judgment against St. Paul requires the Court to determine (1) whether HRC is a "protected person," (2) whether the injury arose out of "use" of a covered auto, (3) whether the damages "resulted from" use of a covered auto, (4) whether the allegations in the underlying complaint implicate premises liability instead of automobile liability, and (5) whether HRC breached certain policy provisions.

Union Standard's and HRC's *Daubert* motions require the Court to determine whether certain expert testimony is admissible.

The Court will address these issues in turn.

-16-

I.     Union Standard's and HRC's Cross-Motions for Summary Judgment.

    A.     Coverage.

The parties cross-move for summary judgment on the issue of coverage of HRC under the
Union Standard policy.  The Union Standard policy provides, "We will pay all sums an 'insured'
legally must pay as damages because of 'bodily injury' or 'property damage' to which this
insurance applies, caused by an 'accident' and resulting from the 'ownership, maintenance or use
of a 'covered auto.'"  The parties dispute whether, under the policy, the Nolan Brunson vehicle is
a "covered auto," whether the bodily injury arose out of "use" a covered auto, and whether the
bodily injury "result[] from" HRC's use of a covered auto.  The parties also dispute whether the
allegations of the underlying complaint trigger business auto coverage or whether they trigger
commercial general liability coverage.

    1.     "Covered Auto".

The Union Standard policy describes a "covered auto," as "any auto," found in the liability
coverage keys symbol "1."  This includes, at a minimum, coverage for autos that are owned,
hired, or borrowed and for autos which are non-owned.  HRC admits that Symbol "1" is the sum
of coverages for Symbols "2" (owned autos), "8" (hired autos), and "9" (non-owned vehicles).
*See* HRC's Resp. to Mot. for Summ J. at p. 2 (indicating that HRC does not dispute Union
Standard's fact number 21, which states that Symbol 1 is the sum of coverages for Symbols 2, 8
and 9).  HRC maintains that the Brunson vehicle is either a "hired auto" or a "non-owned auto."

    a.     Non-Owned Auto.

"Non-owned" autos are defined as "those autos you do not own, lease, hire, rent or

-17-

borrow that are used in connection with your business." HRC maintains that the Nolan Brunson truck was being used in HRC's business to transport and deliver into its yard a mud separator--the very equipment used by HRC in its oil field leasing business. Union Standard argues that because Nolan Brunson was an independent contractor with exclusive control over its own employees and vehicle, the Nolan Brunson truck was not a non-owned vehicle "used in connection with [HRC's] business."

In support of its argument, Union Standard relies upon *North River Insurance Co. v. American Home Assurance Co.*, Civ. No. 01-0231, Mem. Op. & Order, filed 11-22-02 (D.N.M.) (Johnson, J.). In *North River*, the underlying claim involved injury to student passengers in a Shuttlejack bus hired by the Santa Fe School District for a ski trip to the Santa Fe Ski Basin, which was operated by the Santa Fe Ski Company (SFSC). The underlying complaint alleged that SFSC, the insured, was in a joint venture with Shuttlejack. *North River* held that to constitute a vehicle "used in connection with [SFSC's] business" there must be a "sufficient nexus between SFSC and Shuttlejack," *id.*, slip. op. at 11. In defining what type of "nexus" between the insured and the auto would be "sufficient," the Court indicated that it would be greater than a private vehicle turning around in an insured business's parking lot. *Id.* at 10 (citing *Continental Ins. Co. v. Ins. Co. of N. Am.*, 608 So. 2d 1108 (La. Ct. App. 1992) (automobile liability policy covering "any auto" did not cover injuries caused by an accident resulting from the use of a private vehicle that was attempting to turn into the parking lot of an insured's business)). *North River* concluded that if a fact finder determined there was in fact a joint venture or enterprise between SFSC and Shuttlejack, such a relationship would be sufficient nexus to establish that the Shuttlejack bus was

being used "in connection with [SFSC's] business." *Id.*, slip op. at 11.

Union Standard maintains that *North River* requires the Court to conclude that the Nolan Brunson truck was not being used "in connection with [HRC's] business" because Nolan Brunson was an independent contractor with exclusive control over its employees and vehicle. According to Union Standard, *North River* requires "some legal responsibility" to establish a sufficient nexus. *Id.* ("If a fact finder determined that there was a joint venture or enterprise, this would be a sufficient nexus between SFSC and Shuttlejack such that SFSC had some legal responsibility for the use of the Shuttlejack bus.").

A sufficient nexus between an insured and a non-owned vehicle is necessary in order to meet the definition of a "non-owned" vehicle "used in connection with [an insured's] business." *See, e.g.*, *id.* (requiring a sufficient nexus between an insured and the non-owned vehicle at issue); *Bambar v. Lumbermen's Mut. Cas. Co.*, 680 A.2d 901, 903 (Pa. Super. Ct. 1996) (in construing the same "non-owned autos" definition used in the Union Standard policy, holding that the personal vehicle of an employee of an insured was a "non-owned auto" when used in the course and scope of the employee's employment). The policy language "in connection with your business," however, does not limit the type of nexus that might exist. For example, the nexus need not be that the driver of the non-owned vehicle be acting within the scope of his employment with the insured, *cf. id.*, or there need not be a joint venture between the company operating the non-owned vehicle and the insured. *Cf. North River*, slip op. at 11. Although here Nolan Brunson was an independent contractor, and although HRC and Nolan Brunson are separate entities not engaged in a partnership or joint venture, these facts do not negate the existence of a

nexus sufficient to constitute use of the Nolan Brunson vehicle in connection with HRC's business.  To the contrary, the Nolan Brunson vehicle was not simply driving by the premises of HRC, using the premises of HRC to turn around, or delivering mail to the HRC premises.  The vehicle was hired by HRC to pick up and deliver a mud separator rented by HRC's customer, a third-party oil company, to HRC's yard--a task core to HRC's business of leasing oil rig equipment to third parties.  The sole reason the vehicle was on HRC's property was because of HRC's business operations of leasing oil rig equipment.  Under these facts, the Court concludes that as a matter of law a sufficient nexus existed between the Brunson vehicle and HRC to render the vehicle a "non-owned" vehicle used "in connection with [HRC's] business."  *Compare Adams v. Thomason*, 753 So. 2d 416, 420-21 (La. Ct. App. 2000) (no sufficient nexus where the vehicle was owned by an insured cotton gin owner's customer (a cotton farmer) and the trailer pulled by the vehicle was on loan from the insured to the customer, because the vehicle, which was taking cotton *owned by the customer* to the cotton gin and which was being driven by someone *paid by the customer* to deliver the cotton, was being used in connection with the customer's business and not the cotton gin owner's business); *with North River*, slip op. at 11 (vehicle was being used in connection with insured's business because the underlying complaints alleged the parties were in a joint venture).  Accordingly, the Court denies Union Standard's motion seeking a judgment as a matter of law that the Nolan Brunson vehicle is not a "non-owned auto,"[3] and the Court grants

_____

[3] The Court does not consider Union Standard's argument that the non-owned vehicle clause requires an element of control because Plaintiff raised that argument for the first time in its reply.  *See* Reply Mem. of Pl. in Support of Its Mot. for Summ. J. at 6 (citing 8A *Couch on Insurance* § 118.38 (3d ed. 2005)).

HRC's motion seeking a declaration that the vehicle is a "non-owned auto."

> b.  <u>Hired Auto</u>.

"Hired autos" are defined as "those autos you lease, hire, rent or borrow . . . ."  HRC maintains that since HRC hired Nolan Brunson to transport and place mud separators in its yard, the Brunson vehicle is a "hired auto."  In contrast, Union Standard argues that vehicles owned and used by independent contractors do not constitute "hired autos" when the contractor has exclusive control over the use of the vehicle.

The term "hire" has been defined as "engaging the temporary use of for a fixed sum." *Pawtucket Mut. Ins. Co. v. Hartford Ins. Co.*, 787 A.2d 870, 873 (N.H. 2001).  "Hire" has also been likened to hiring a taxicab where the insured is not physically in control of the vehicle but the insured remains covered as a "hired" auto.  *Travelers Indem. Co. v. Swearinger*, 169 Cal. App. 3d 779, 786 (Cal. Ct. App. 1985); *see also Pawtucket*, 787 A.2d at 873 (holding that an insured "hired or leased" a rental car that was rented by the insured's employee where insured did not exercise an element of control over the vehicle).  *But see Holmes v. Brethren Mut. Ins. Co.*, 868 A.2d 155, 158 n.3 (D.C. Ct. App. 2005) ("The unexplained assertion of the court in *Pawtucket Mutual* . . . that the common definition of 'hire' does not require an element of control must be considered a distinctly minority view.").  On the other hand, the majority of courts have found that automobiles owned and used by independent contractors hired by an insured do not constitute "hired autos" where the contractor has exclusive control over the use of the vehicle or where the contractor does not have the right to direct the use of the vehicle.  *Id.* at 159 ("[i]n keeping with these decisions of other courts, the trial judge here correctly viewed the dictionary

definition of a 'hired auto' . . . (i.e., one whose temporary use has been engaged . . . for a fixed

sum[]) as signifying the exercise of control by the named insured over matters such as the choice

of vehicle, where it is to travel, by what routes, and for what purposes"); *Wolverine Ins. Co. v.*

*State Auto. Mut. Ins. Co*., 415 F.2d 1182, 1184 (6th Cir. 1969) ("The right to control of

equipment is generally regarded as the critical distinction between the 'hired automobile' and the

'nonowned automobile' for insurance contract purposes"); Lee R. Russ & Thomas F. Segalla,

COUCH ON INSURANCE § 118.46, at 118-74 (3d ed. 1997) ("the key inquiry regarding

whether an automobile will fall within the hired automobiles provision of the policy is whether the

insured exercised dominion, control or the right to direct the use of the vehicle"); *Id.* at 118-75

(citing cases) ("automobiles which are owned and being used by . . . independent contractors

hired by the insured will not constitute hired automobiles . . . because, under most circumstances,

the . . . independent contractor exercises independent control over the vehicle, not the insured").

      The Court need not decide whether an element of control or the right to direct is

necessary to a finding that a vehicle is "hired," because even if the Court were to find such a

requirement, the Court concludes that there is a material question of fact whether HRC had at

least some control over or the right to direct the Nolan Brunson vehicle or whether Nolan

Brunson exercised exclusive control over the vehicle.  Specifically, there is factual question

whether HRC directed Nolan Brunson in its use of the vehicle to place the mud separator.  In

addition, it is undisputed that HRC did have the right to control the locations the vehicle would

travel to and the purposes for which the vehicle would travel.  *Cf. Holmes*, 868 A.2d at 159

(definition of "hired auto" requires "at least some control" over "matters such as the choice of

vehicle, where it is to travel, by what routes, and for what purposes"). According, the Court

denies Union Standard's and HRC's motions for summary judgment seeking a judgment as a

matter of law regarding application of the "hired auto" provision to the facts of this case.

      Union Standard's citation to *Holmes* does not persuade the Court otherwise. In *Holmes*,

the court found that the insured "Bingo World" did not exercise "even nominal control" over

Harris Transportation, a business that used its own vehicles and drivers to transport bingo players

to area bingo parlors, including Bingo World. *Id.* at 156, 158. By oral agreement, Bingo World

contracted to pay Harris Transportation $15 for each customer Harris brought to Bingo World.

*Id.* at 156. The court concluded that:

> Bingo World had no control over Harris' choice of van, who would
> drive it or what routes the driver would follow, and how many
> players he would bring or even whether he would show up with
> customers on a given night. Harris had exclusive control over his
> choice of passengers -- for all Bingo World knew, he transported
> riders to other locations on the same trip that brought some to
> Bingo World. In reality, Bingo World did not hire Harris' van but
> rather his service of finding and transporting customers (it does not
> matter that Bingo World would forward him the names of players
> who had inquired about transportation), paying him only if and to
> the extent he appeared at the door with them.

*Id.* at 159. According to the court, "That relationship, contrary to appellants' argument, [was]

not analogous to hiring a taxi or limousine and driver where, in return for a fare or fee, the person

hiring acquires significant control over who is to occupy the vehicle, its destination, and the route

it is to take in getting there." *Id.* at 159-60. Here, in contrast, it is undisputed that HRC had

control over Nolan Brunson's choice of cargo, where it would pick that cargo up, and where it

would drop that cargo off. A material question of fact exists with respect to whether HRC

directed Nolan Brunson to place the cargo in a certain location at the HRC yard.  It is undisputed
that Nolan Brunson was contracted to deliver the cargo to the HRC yard, and therefore it was
required to show up with the cargo, and it is undisputed that HRC was required to pay Nolan
Brunson to pick up, transport, and deliver the cargo.  Because there is a factual question whether
HRC exercised sufficient control over the Nolan Brunson vehicle to render that vehicle "hired"
within the meaning of the Union Standard policy, this case is distinguishable from *Holmes*.

   Union Standard also points to cases adopting a "separate contract," *see Russom v. INA*,
421 F.2d 985 (6th Cir. 1970) ("[w]here there is a separate contract hiring or leasing a vehicle in
addition to an agreement to haul a particular load, courts have held that the vehicle becomes a
"'hired automobile'") (citations omitted); *Sprow v. Hartford Ins. Co.*, 594 F.2d 418, 422 (5th Cir.
1979) ("for a vehicle to constitute a hired automobile, there must be a separate contract by which
the vehicle is hired or leased to the named insured for his exclusive use or control") (citations
omitted), or bright-line independent contractor test, *Am. Cas. Co. v. Denmark Foods*, 224 F.2d
461 (4th Cir. 1995) (truck used under an independent contract is not a hired auto); *compare*
*Transport Indem. Co. v. Liberty Mut. Ins. Co.*, 620 F.2d 1368, 1371-72 (9th Cir. 1980).  The
Court first notes that all of these cases involved policies with more restrictive definitions of "hired
auto."  Specifically, the policies defined "hired auto" as an automobile used "under contract" and
"in behalf of the named insured," *Russom*, 421 F.2d at 993 (emphasis added).  Here, "hired auto is
defined as "[t]hose autos you lease, hire, rent or borrow."  Accordingly, the Court does not
believe that the separate contract rule requiring lease to the insured for its exclusive use or
control, or the independent contractor rule excluding all vehicles of independent contractors,

-24-

apply here.[4]  *Cf. Chicago Ins. Co. v. Farm Bureau Mut. Ins. Co.*, 929 F.2d 372, 373-74 (8th Cir. 1991) (finding no coverage where policy defined "hired automobile" as "an automobile not owned by the named insured which is used under contract in behalf of, or loaned to, the named insured," provided that it did not cover injury occurring "while the automobile is not being used exclusively in the business of the named insured," and where parties did not dispute the district court's holding that the policy language "used exclusively in the business of" and "under contract in behalf of" precluded its recovery if Locust Farms acted as an independent contractor).  Moreover, the Court notes that to the extent the term "hire" is ambiguous, that term must be construed in favor of the insured.

      c.     <u>Mobile Equipment</u>.

Union Standard maintains that the Nolan Brunson vehicle is not covered under its policy because it is "mobile equipment."  The Union Standard insurance policy defines "auto" as "a land motor vehicle, trailer, or semi-trailer designed for travel on public roads but does not include 'mobile equipment.'"  "Mobile equipment" is defined as "vehicles . . . whether self-propelled or not, maintained primarily to provide mobility to permanently mounted: (A) Power cranes, shovels

---

[4] Although *Toops v. Gulf coast Marine, Inc.*, 72 F.3d 483 (5th Cir. 1996), adopted a separate contract and exclusive control rule on policy language similar to that at issue here, the Court does not believe the plain reading of the language of Union Standard's policy defining "hired autos" as "those autos you lease, hire, rent or borrow," requires a separate contract.  Such a rule may be appropriate under policies defining a "hired auto" as an automobile used "under contract**"** and "in behalf of the named insured," but it is not appropriate under the terms of the Union Standard policy.  Moreover, to the extent that "hire" is ambiguous, and there are two reasonable interpretations, the Court is bound to interpret the term in favor of the insured.  *See Computer Corner*, 32 N.M. at 267, 46 P.3d at 1267, *cited in Berry*, 136 N.M. at 472, 99 P.3d at 1184.

or loaders." According to Union Standard, the primary purpose of the Nolan Brunson vehicle was to load and unload equipment. HRC maintains that the vehicle's primary purpose was to transport equipment and crew.

The question whether the Brunson vehicle was maintained "primarily" to provide mobility to permanently mounted equipment is a legal question to be determined by the Court. Mr. Brunson testified that the primary purpose of using the vehicle was to load and unload equipment via the gin pole. The Court is not bound to accept Mr. Brunson's testimony as a legal conclusion but rather considers it only as a fact relevant to the Court's determination of the primary use of the Brunson vehicle. Mr. Brunson also testified that the vehicle was used to transport equipment and crew, and that Nolan Brunson's primary business is transporting oil equipment through the use of trucks. Indeed, on the day of the accident, the truck was being used to transport a mud separator leased to a third-party from the company's oil field location and to return that mud separator to the HRC yard. The Brunson truck, a 1998 International, was not designed or sold for the purpose of loading and unloading equipment via a winch and gin pole. Rather, it was a vehicle fully licensed in the state of New Mexico to travel on highways and roadways. As an oilfield trucking business, Nolan Brunson used the truck to travel anywhere from one to 200 miles to pick up and drop off equipment, including mud separators. The gin pole was not originally affixed to the truck. Rather, Nolan Brunson contracted out to another entity to affix the gin pole to the truck.

For purposes of deciding Union Standard's motion, the Court must construe the facts in the light most favorable to HRC. Construing the facts in HRC's favor, the Court concludes that

on these facts the Brunson truck was not used primarily for the purpose of providing mobility to the gin pole and winch or for moving the gin pole and winch from one location to another. The primary purpose of the truck was to transport heavy, oil field equipment, which was the essence of Nolan Brunson's oilfield trucking business. To load and unload this heavy equipment onto the truck, the truck was affixed with a gin pole and winch which allowed Nolan Brunson to accomplish its primary purpose of transporting the heavy equipment on the truck from point A to point B. The loading and unloading of the vehicle was incidental to the truck's main purpose of transporting the oilfield equipment, while the use of the roads to travel from one location to another was primary to Nolan Brunson's oilfield equipment trucking business. Because the facts construed in the light most favorable to HRC demonstrate that the Nolan Brunson vehicle was not mobile equipment and because the Court is obligated to construe exclusions narrowly, the Court denies Union Standard's motion for summary judgment seeking a declaration that the Nolan Brunson vehicle constitutes "mobile equipment" within the meaning of the policy.[5]

Union Standard's citation to *Russo v. Veran, Inc.*, 488 So. 2d 372 (La. Ct. App. 1986), does not persuade the Court otherwise. In *Russo*, a gin pole truck was hired to the yard of Veran to lift a 26,000 pound "bull gear" out of a pump. *Id.* at 373. The job did not involve transporting

---

[5] Because the Court already has determined that the exclusion does not apply, the Court need not consider whether the exclusion applies based upon HRC's contention that the gin pole and winch were not permanently affixed. The Court also need not consider Union Standard's argument that coverage is barred under a policy exclusion that excludes coverage for "bodily injury . . . resulting from movement of property by a mechanical device (other than a hand truck) unless the device is attached to the covered "auto." Because a material question of fact exists with respect to whether the Brunson vehicle constitutes "mobile equipment" instead of a "covered auto," a material question of fact exists with respect to whether this exclusion bars coverage on the ground that the Brunson vehicle is a "mechanical device" not attached to a "covered 'auto.'"

the bull gear from one location to another, but rather utilizing the vehicle merely to lift the bull gear out of the pump. *See id.* Here, on the facts construed in HRC's favor, the primary purpose of the gin truck at issue was to transport the mud separator from an oil field location to the HRC yard. Loading the mud separator onto and off of the truck was incidental to the return of the mud separator from the oil field of the third-party oil company who had leased the separator from HRC to the HRC yard.

*Alpine Insurance Co. v. Planchon*, 85 Cal. Rptr. 2d 777 (Cal. Ct. App. 1999), is likewise distinguishable. The *Planchon* court, in construing a policy defining mobile equipment as "[v]ehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo," held that a scissor-lift vehicle involved in an incident for which an insured sought coverage constituted "mobile equipment," because the primary purpose of the vehicle was to provide mobility to the scissor-lift and to allow workmen to elevate roofing materials up to the level of their work site. *Id.* at 780 n.1. In *Planchon*, however, the insured was in the roofing, and not transportation, business, and the scissor-lift vehicle was *always* used to elevate materials to roof level to allow the roofers do their jobs. *Id.* Although the roofers *sometimes* used the vehicle to haul building materials, they did not always do so. *Id.* In *Planchon*, transportation was incidental and lifting primary. Here, on the facts construed in HRC's favor, lifting was incidental to the primary business to transporting heavy, oilfield equipment.

Other cases finding that vehicles constituted "mobile equipment" likewise are distinguishable. In these cases, the primary purpose of the vehicles was not transportation of

cargo from one location to another.  Rather, the primary purpose of the vehicles was to act as a

machine, at a fixed location; the fact that the machines traveled from one location to another was

secondary and incidental to their primary purpose of acting as machines.  *See, e.g.*, *Scottsdale Ins.*

*Co. v. Nat'l Security Fire & Cas. Ins. Co.*, 741 So. 2d 424 (Ala. Ct. App. 1999) (1979 model

Ford F350 truck equipped with two winches and a boom-like crane met definition of "mobile

equipment" where the insured, who was in the business of servicing radio towers, was hired to

remove a "gin pole" from a 350-foot radio tower); *State Farm Mut. Auto. Ins. Co. v. Farmers*

*Ins. Group*, 569 P.2d 1260 (Wyo. 1977) (self-propelled concrete pumping machine met definition

of "mobile equipment" where the insured used the truck at construction sites to pump concrete

into construction forms and where the only purpose of the machine was to pump concrete into the

forms; the fact that the machine could by its own power be moved from place to place for the

purpose of pumping concrete did not change the fact that the primary purpose of the machine was

to pump concrete); *Am. States Ins. Co. v. Broeckelman*, 957 S.W.2d 461 (Mo. Ct. App. 1997)

(1971 International truck met definition of "mobile equipment" where the truck was used only to

transport the crane from job to job, and the accident was caused when the crane was lifting debris

and the boom broke causing injuries); *Commercial Union Assur. Cos. v. Aetna Cas. & Sur. Co.*,

455 F. Supp. 1190, 1193-94 (D.N.H. 1978) (trench-digging machine met definition of "mobile

equipment" where insured was performing sewer construction contract and the accident was

caused when another vehicle collided with the parked machine).  If the Nolan Brunson vehicle had

been used to move the mud separator solely on the premises of a third-party oil company, *cf.*

*Scottsdale*, 741 So.2d 424 (job limited to servicing a radio tower); *Russo*, 488 So. 2d 372 (job

-29-

limited to lifting a 26,000 pound "bull gear" out of a pump); *State Farm*, 569 P.2d 1260 (job

limited to pumping concrete into construction forms at a construction site); *Broeckelman*, 957

S.W.2d 461 (job limited to using a crane at a construction site); *Commercial Union Assur.*, 455

F. Supp. at 1193-94 (job limited to performing sewer construction contract on site), and not to

pick up oil equipment leased to an oil company and return that leased equipment to the HRC yard,

and if HRC were in the business of performing mechanical work on-site at oil fields instead of

leasing oil equipment to third parties, which necessarily includes transporting that equipment to

and from the oil company sites, the Brunson vehicle would constitute "mobile equipment" under

the Union Standard policy.

Other courts have recognized the dual design concept of vehicles as both "autos" and

"mobile equipment."  These courts "have applied to devices such as that involved here a

'Pegasus' principle.  In a very pragmatic context they have held or indicated that while being

driven from place to place [the vehicle] is an automobile because under those circumstances it is

like any other truck carrying any other load from one point to another."  *State Farm*, 569 P.2d at

1262 (citing cases).  "Conversely, they also have recognized that when set up in place to perform

its primary function such a machine is no longer an automobile, but at that point and at that time it

is being used for its other designed function.  It then no longer is to be considered an automobile

or motor vehicle under the definitional terms of the policy."  *Id.* (citing cases).  There is no basis

in the Union Standard policy, however, for making such a distinction based upon the type of use

of the Nolan Brunson vehicle.  *Cf. Scottsdale*, 741 So. 2d at 426-27 ("there is no basis in the

policy for distinguishing among the various 'uses' to which the truck could be put; the policy

provides simply that National Security will pay all sums Webb must pay as damages caused by an accident and resulting from the 'use' of a covered auto"); *St. Paul Fire & Marine Ins. v. Commercial Union Assur.*, 606 P.2d 1206, 1208 (Utah 1980) ("We do not agree with plaintiff that under the basic policy and endorsement the vehicle in question could at times be treated as an 'automobile' and at other times be treated as 'mobile equipment.' Had it been the intention of the parties that the vehicle could at times be considered an 'automobile' and at times 'mobile equipment' that intention could have been easily and clearly expressed."). In addition, the Court notes that the use of "primarily" in the definition of mobile equipment indicates the parties' recognition that vehicles can have multiple purposes, and their intention to classify vehicles as "mobile equipment" only if their "primary" purpose is to "provide mobility to" equipment. The Court therefore declines to consider the Brunson vehicle as a "covered auto" while transporting equipment and "mobile equipment" while loading and unloading equipment.

The Court must likewise deny HRC's cross-motion for a judgment as a matter of law declaring that the Nolan Brunson vehicle is not "mobile equipment" under the Union Standard policy. Construing the facts in the light most favorable to Union Standard as the party opposing summary judgment, the Court concludes that one fact, Mr. Brunson's testimony that the primary purpose of the vehicle is to load and unload cargo, precludes the Court from finding as a matter of law that the Brunson vehicle does not constitute "mobile equipment." Although the Court is not required to accept this testimony as a legal conclusion, the testimony is one fact the Court must consider in deciding whether to grant HRC's motion. Although scant, this testimony, when viewed in the context of the Court's obligation to construe the evidence in Union Standard's

favor, is sufficient to raise a material question of fact whether the Brunson vehicle constitutes "mobile equipment." *See Alpine*, 85 Cal Rptr. 2d at 781 ("the primary purpose for which a vehicle is maintained is more sensibly viewed as calling for either the subjective opinion of the insured that maintains the vehicle or an objective evaluation of how the vehicle is used by the insured"; "[a]lthough the authorities in this area are sparse, they demonstrate that whether a vehicle is classified as an automobile or mobile equipment is ordinarily treated as an issue of fact") (citing *Ryan v. Mike-Ron Corp.*, 37 Cal. Rptr. 794 (Cal. Ct. App. 1964); *Gaumnitz v. Indemnity Ins. Co.* 37 P.2d 712, n7 (Cal. 1934)).[6]

       2.      <u>"Use" of a Covered Auto</u>.

The Union Standard policy provides, "We will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' . . . resulting from the ownership, maintenance or *use* of a covered 'auto.'" (Emphasis added.) Union Standard maintains that the policy does not provide coverage because HRC was not "using" or physically operating the Nolan Brunson vehicle. HRC argues that the plain language of the policy contains no requirement that the insured use or

--------

[6] *Compare Alpine*, 85 Cal. Rptr. 2d at 781 ("This is not to decide, however, that the sole or primary purpose for which a vehicle is designed, maintained, or used cannot be so apparent that it can be characterized as matter of law. The point is easily illustrated by fire trucks. Because they have the power of self-propulsion and are designed for travel on the public roads, they might appear to meet the definition of 'auto.'" But they obviously fall within the same provision relied upon by defendants--'Vehicles . . . maintained primarily for purposes other than the transportation of persons or cargo.' A secondary purpose of a hook-and-ladder truck is transportation of persons, *i.e.*, and the firefighters who drive, steer, and man it. The truck's primary purpose, design, and use become clear only when that truck arrives at the scene of a fire. The essence of that massive machinery is the ladder, which can elevate firefighters to heights where high-rise blazes may be fought and lives may be saved. The truck has no real function apart from serving as a mobile platform for that ladder.")

control the vehicle.

In *North River Insurance Co. v. American Home Assurance Co.*, the Court rejected the argument that coverage can only exist if the insured was using the covered auto. The Court stated, "I find that the policy clearly does not limit coverage to vehicles that are owned, maintained or used by [the insured]." Slip op. at 10. The Court explained that the policy provided, "We will pay all sums an insured legally must pay as damages because of bodily injury . . . caused by an accident and resulting from *the* ownership, maintenance or use of a covered auto." *Id.* at 9 (emphasis in original) (internal footnote omitted). The Court held that the word "the" was "critical to the Court's finding that the coverage is not limited to a vehicle being used by the insured." *Id.* at 9 n.2. The Court reasoned, "If the word here had been "your" or "the insured's," the Court would have reached a different result." *Id.* The Court agrees with *North River's* conclusion. Nowhere in the Union Standard policy language does it limit "use" to "use" by the insured. Indeed, in the very same sentence the policy language specifically states that the insurer will "pay all sums an *insured* legally must pay as damages, " indicating that the insurer could, and did, choose to use "insured" when it meant "insured." *Id.* at 9. Accordingly, based upon the plain language of the policy, the Court concludes that HRC need not be the party "using" the Nolan Brunson vehicle. The Court therefore denies Union Standard's motion for summary judgment seeking a declaration from this Court that the accident arose out of the "use" of the Nolan Brunson vehicle within the meaning of the Union Standard policy.[7]

---

[7] *Apcon Corp. v. Dana Trucking, Inc.*, 623 N.E.2d 806 (Ill. Ct. App. 1993), does not persuade the Court otherwise. That case dealt with interpretation of whether a general road contractor was an "insured" under a subcontractor's liability policy based upon language defining

3.      "Resulting From" Use of a Covered Auto.

The Union Standard policy provides, "We will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' . . . *resulting from* the . . . use of a covered 'auto.'"  Union Standard maintains that under the efficient and predominating cause test its policy does not provide coverage because the injury did not result from the use of a covered auto but rather from the maintenance of hazardous premises.  HRC disagrees, arguing first that the "some causation between the injury and the use of the vehicle" test applies, and second that even under the "efficient and predominant cause" test, the injury resulted from the use of a covered auto.

In *Southern California Petroleum Corp. v. Royal Indemnity Co.*, 70 N.M. 24, 369 P.2d 407 (N.M. 1962), an oil company ("SCPC") contracted with B.J. Service, insured by Royal Indemnity, to perform the operation of cementing an oil string.  SCPC was instructed by the State Oil and Gas Commission to cement its oil string before drilling, but failed to comply with this instruction.  When SCPC drilled first, the drilling caused a small amount of gas to escape and oil to pool.  Thereafter, SCPC began to cement its oil string, using B.J. Service's specially constructed trucks with pressure tanks that forced a mixture of cement and water to the top of the oil string, into the casing, and up through the drilled hole on the outside of the casing.  As the cement fixture was forced through the casing, it caused a trapped pocket of oil and gas suddenly

---

the insured as "anyone else while using with your permission a covered auto *you* own, hire or borrow."  *Id.* at 809; *see also S. Cal. Petroleum Corp. v. Royal Indem. Co.*, 70 N.M. 24, 369 P.2d 407 (N.M. 1962) (concluding that a company employing an independent contractor was not an "insured" under the contractor's policy, where the policy language provided that an "insured" includes "any person while using a [covered] automobile," absent the "exercise of any supervisory control over the vehicle" by the company when the use of the vehicle was by the contractor).

to rise to the surface, which in turn caused an explosion resulting in personal injuries and property damage. SCPC sought coverage from Royal Indemnity under B.J. Service's insurance policy. In denying coverage, the court concluded that the cause of the injuries was not the loading and unloading of the B.J. Service vehicle, but rather the "antecedent" actions of SCPC in drilling the sand prior to cementing its oil string. The court explained that the "general rule seems to be that an accident is covered by [a] 'loading and unloading' clause [granting coverage] only if the loading or unloading was the efficient and predominating cause of the accident." *Id.* at 29, 369 P.2d at 411 (quoting 160 A.L.R. 1259, at 1272 and citing *Gamble-Skogmo, Inc. v. St. Paul Mercury Indemnity Co.*, 242 Minn. 91, 64 N.W.2d 380). Likewise, in *General Accident Fire & Life v. Brown*, 181 N.E.2d 191 (Ill. Ct. App. 1962), the court concluded that it was the premises, *i.e.*, a defective loading dock, and not the loading or unloading of a vehicle, that was the efficient and predominating cause of the plaintiff's injury. *See also Pecos Valley Cotton Oil, Inc. v. Firemen's Fund Ins. Co.*, 780 F.2d 892 (10th Cir. 1986) (personal injuries sustained when an employee who drove a truck onto a ramp to unload cotton seed was injured when a door fell on him because the efficient and predominating cause of the accident was not the loading and unloading of the vehicle but rather the premises).

HRC maintains that in *Sanchez v. Herrera*, 109 N.M. 155, 783 P.2d 465 (N.M. 1989), the New Mexico Supreme Court replaced the "efficient and predominating cause" test with the "reasonable connection to the use of the vehicle." Union Standard argues that the *Sanchez* court specifically limited its ruling to hunting accidents involving the use of automobiles and that the *Sanchez* holding does not apply to loading and unloading cases. *Sanchez* recognized that

"generally courts have firmly rejected any notion of proximate causation and have required instead only that there be some causation between the injury and the use of the vehicle." *Id* at 157, 783 P.2d at 467. The court concluded that the unloading of guns in the cab of a pickup truck was "foreseeably incident to the use of that vehicle,"explaining that "[i]t is foreseeable that, however unwise it may be, some hunters will load and unload their guns within their trucks." *Id.*; *compare Am. Gen. Fire & Cas. v. Progressive*, 110 N.M. 741, 799 P.2d 1113 (N.M. 1990) (injuries arising when a person unloaded another person in a wheelchair from a van were caused by use of the vehicle because the cause of the accident was reasonably connected to a use of the vehicle).

     The Court need not determine whether the test articulated in *Sanchez* replaces the efficient and predominate cause test or whether the efficient and predominate cause test still applies to cases involving the loading or unloading of vehicles, because under either test the Court believes that the injury resulted from the use of the Nolan Brunson vehicle and not from the maintenance of HRC's premises. The efficient and predominate cause test requires a "close causation relationship between the use of the vehicle and the accident; mere coincidence of the two events is insufficient." *Pecos Valley*, 780 F.2d at 894 (citing *Southern California*, 70 N.M. at 30, 369 P.2d at 413). The test appears to be akin to proximate cause. *See S. Cal.*, 70 N.M. 24, 369 P.2d 407 (no liability for an accident that occurred during the unloading of a cement truck to cement an oil well when the proximate cause of the accident was the negligence of the well owner or others). The *Sanchez* test requires the Court to determine "whether the use made of the vehicle at the time of the accident logically flows from and is consistent with the foreseeable uses of that vehicle." 109 N.M. at 157, 783 P.2d at 467.

On the undisputed facts before the Court, the Court concludes that the accident would not have occurred but for the fact that the Nolan Brunson truck with its attached gin pole was being driven.  The vehicle was not merely being loaded or unloaded, but rather, as the allegations and facts in the underlying case indicate, was actually in motion, and the motion itself was the proximate cause of the injury.  Because the accident would not have occurred had the vehicle remained stationary, it is clear that the efficient and predominate cause of the injury was the use of the vehicle, and not the premises of the HRC yard.  *Compare Brown*, 181 N.E.2d 191 (concluding that a defective loading dock and not the use of the vehicle was the efficient and predominate cause of the injury where the vehicle was stationary and being loaded with cargo, and the underlying plaintiff fell while stepping from the loading dock to the truck, because the accident "was caused directly by some independent factor or intervening cause wholly disassociated with and remote from the use of the truck"); *Pecos Valley Cotton Oil*, 780 F.2d 892 (the efficient and predominant cause of the accident was a faulty weld and not the unloading of the tractor/trailer where the vehicle was stationary, the underlying plaintiff was transferring cottonseed from the truck into a seed pit, and a large, open iron door covering the seed pit fell on the plaintiff causing injuries, because the seed pit door was a separate or supervening cause).  It is also true that the use of the vehicle at the time of the accident, *i.e.*, backing it up in preparation for unloading cargo, logically flows from and is consistent with the foreseeable uses of the vehicle.[8]  *Cf. Sanchez*, 109

---

[8] In addition, the underlying complaint specifically alleges that HRC breached its duty of care by negligently storing mud separators directly under inherently dangerous power lines where it was *readily foreseeable* that a worker moving or handling separators could come into contact with the power line.

N.M. at 157, 783 P.2d at 467.  Accordingly, the Court denies Union Standard's motion for

summary judgment seeking a declaration that the injury did not "result from" the use of the

Brunson vehicle, and grants HRC's motion for summary judgment seeking a declaration that the

injury "resulted from" the use of the vehicle.

4.    <u>Business Auto vs. Commercial General Liability</u>.

Union Standard moves for summary judgment and defends against HRC's motion for

summary judgment on the ground that the allegations of the underlying complaint trigger a

comprehensive general liability insurance policy issued to HRC by Reliance instead of the business

auto policy issued to HRC by Union Standard.  Whether the allegations and facts in the

underlying litigation trigger a duty to defend or indemnify under the CGL policy is not relevant to

the question whether the allegations and facts of the underlying action trigger a duty to defend

and indemnify on the part of Union Standard.  In determining whether Union Standard has a duty

to defend and indemnify HRC, the Court looks to the underlying litigation and the terms of the

Union Standard policy.  The Court already has concluded that a material question of fact exists

with respect to whether the Nolan Brunson vehicle is a covered auto or whether it is mobile

equipment, that the accident arose out of the "use" of the Nolan Brunson vehicle as a matter of

law, and that the accident "resulted from" the use of the vehicle as a matter of law.  The Court

made these determinations based upon the allegations and facts of the underlying litigation and the

terms of the Union Standard policy.  Union Standard's argument that the allegations and facts in

the underlying action implicate coverage under the Reliance CGL policy is not relevant to and

does not alter the Court's conclusions with respect to Union Standard's obligations to HRC under

its policy.

      B.      <u>Waiver of Policy Defenses</u>.

      1.      <u>Failure to Defend</u>.

Defendant HRC moves for summary judgment seeking a declaration that Union Standard is required to defend and indemnify HRC on the ground that Union Standard waived its right to contest coverage by denying HRC a defense for more than two years after its agent was notified of the loss.  HRC maintains that *State Farm Fire & Casualty Co. v. Ruiz*, 36 F. Supp. 2d 1308, 1318 (D.N.M. 1999), and *Valley Improvement Ass'n v. United States Fidelity & Guar. Corp.*, 129 F.3d 1108, 1125-26 (10th Cir. 1997), support the conclusion that an insurer loses the right to complain of lack of coverage when it refuses to defend.

*Ruiz* and *Valley Improvement* stand for the proposition that an insurer who has wrongfully refused to defend, where such wrongful refusal to defend was determined by a court, cannot assert policy defenses to avoid its duty of indemnification for an insured's settlement of an underlying action.  *Ruiz*, 36 F. Supp. 2d at 1317-18 (insurer who the court found had "unjustifiably refused to defend its insured" would no longer be able to "raise any coverage defenses and [would be] liable for the amount of the settlement . . . to the extent that the settlement was reasonable and entered into in good faith"); *Valley Improvement*, 129 F.3d at 1126 ("because we have affirmed the district judge's holding that [the insurer] breached its duty to defend, [the insurer] will not be heard to complain that the claims might not have been within the coverage" and that the insured therefore is not obligated to pay the insured's settlement of the underlying claim).  These cases do not stand for the proposition that an insurer who refuses to

defend absolutely waives its right to assert policy defenses.  Such a sweeping conclusion would mean that any time an insurer refuses to defend, even if its refusal is based upon a sound reading of the allegations of an underlying complaint, the insurer waives its right to assert coverage defenses, or that anytime an insurer refuses to defend, that insurer cannot seek a judicial determination of its duty to defend based upon its policy defenses.  Rather *Ruiz* or *Valley Improvement* stand for the proposition that if there has been a judicial determination that an insurer wrongfully has refused to provide a defense, the insurer cannot raise coverage defenses with respect to its duty to indemnify an insured for its settlement of the underlying case while represented.

Here, there has been no judicial determination that Union Standard breached its duty to defend.  The Court has concluded that a material question of fact exists with respect to whether the Nolan Brunson vehicle was a "covered auto" or "mobile equipment."  In addition, the Court notes that it is unclear whether *Ruiz* and *Valley Improvement* apply when Union Standard was defending HRC at the time HRC entered into the settlement agreement.  Accordingly, the Court denies HRC's motion for summary judgment seeking a declaration that Union Standard has waived its right to assert coverage defenses.

                2.        Delay in Sending Reservation of Rights Letter.

The parties also dispute whether Union Standard waived its right to contest coverage where it initially assumed the defense of HRC but subsequently issued a reservation of rights letter.  Because HRC has not presented evidence of any prejudice, the Court denies HRC's motion seeking a declaration that Union Standard has waived its right to contest coverage based

upon this ground.

       3.     <u>Failure to Assert Policy Defense in Reservation of Rights Letter</u>.

HRC maintains that Union Standard is estopped from contesting coverage on the ground that the Nolan Brunson vehicle is not a "covered auto," because it issued a limited reservation of right letter in which it failed to assert this ground. The Court disagrees. The undisputed facts indicate that Union Standard raised this defense originally in its reservation of rights letter. The letter from Union Standard indicates that it was tendering a defense with a "full reservation of" rights, that it was reserving its rights "as described [in the letter] but without limiting its right to assert additional grounds for reservation of rights," that it was the position of Union Standard that with respect to coverage the underlying claims for bodily injury "were not the result of ownership, maintenance or use of a covered auto," and that other exclusions, including the exclusion related to "movement of property by mechanical device" and the exclusion applying to bodily injury "arising out of the operation of any . . . 'mobile equipment,'" apply to bar coverage. The letter specifically reserves Union Standard's right to contest coverage on the ground that the Brunson vehicle is not a covered auto and that it constitutes mobile equipment. Accordingly, the Court denies HRC's motion seeking a declaration that Union Standard is estopped from contesting coverage.

      C.     <u>Reimbursement of Defense Costs</u>.

       1.     <u>HRC's Defense Costs</u>.

HRC moves for summary judgment on its claim for reimbursement of defense costs in the amount of $43,290.66 incurred in defending the underlying litigation prior to Union Standard's

assumption of a defense.  Generally, when an insurance company fails to timely defend its insured and such failure results in the insured incurring defense costs, the carrier is "liable for reasonable attorneys' fees incurred by the insured in the defense of the action brought against [it]."  *Lujan v. Gonzales*, 84 N.M. 229, 238, 501 P.2d 673, 682 (N.M. Ct. App. 1972).  "[B]efore a duty to defend arises there must be a demand."  *State Farm Fires & Cas. Co. v. Price*, 101 N.M. 438, 443, 684 P.2d 524, 529 (N.M. Ct. App. 1984), *overruled on other grounds by Ellingwood v. N.N. Investors Life Ins. Co.*, 111 N.M. 301, 805 P.2d 70 (N.M. 1991); *Am. Gen. Fire & Cas. Co. v. Progressive Cas. Co.*, 110 N.M. 741, 747, 799 P.2d 1113, 1119 (N.M. 1990).  Union Standard maintains that HRC is not entitled to judgment in its favor as a matter of law because a genuine issue of material fact exists with respect to whether HRC made a demand in February 2002, or whether the first demand on Union Standard was received on April 8, 2003.  Union Standard also maintains that a material question of fact remains whether the defense costs and fees were reasonable and necessary.  The Court agrees that HRC has presented no evidence to indicate that its fees and costs were reasonable and necessary.  With respect to whether HRC made a demand for coverage prior to April 8, 2003, the Court need not reach that question because the Court already has held that a material question of fact exists with respect to whether the Nolan Brunson vehicle is a covered auto or mobile equipment under the policy.  The Court therefore denies HRC's motion for summary judgment on its claim for reimbursement of defense costs.

        2.      <u>Union Standard's Defense Costs</u>.

Union Standard likewise moves for summary judgment on its claim for reimbursement of its defense costs expended in the underlying litigation and for reimbursement of its defenses costs

expended in defending against HRC's bad faith claim.  Because the Court has held that a material question of fact exists with respect to whether the Nolan Brunson vehicle is a "covered auto" or "mobile equipment," the Court cannot conclude as a matter of law that Union Standard did not have a duty to defend HRC in the underlying litigation.  The Court therefore denies Union Standard's motion.

II.      Union Standard's Motion for Summary Judgment Against St. Paul.

        In the event that the Court finds coverage of HRC under the Union Standard policy of insurance, Union Standard moves for summary judgment against St. Paul on the ground that St. Paul has a similar duty to defendant and indemnify HRC in the underlying litigation.  Union Standard and St. Paul dispute (1) whether HRC constitutes a "protected person," or whether certain exclusions apply to prohibit HRC from being so defined, (2) whether the injury arose out of "use" of the Nolan Brunson vehicle, (3) whether the damages "result[ed] from the . . . use" of the Brunson vehicle, and (4) whether the allegations of the underlying complaint are rooted in premises liability.  The parties also dispute whether HRC breached certain conditions in the St. Paul policy that preclude HRC from seeking coverage.  The Court need not address these issues, however, because the Court has not found coverage under the Union Standard policy.  Rather, the Court has concluded that a factual question exists with respect to whether the Nolan Brunson vehicle constitutes a "covered auto" or whether it constitutes "mobile equipment" excluded from coverage.  Accordingly, Union Standard's motion seeking a finding of coverage against St. Paul should the Court find coverage against Union Standard is denied as moot.

III.     Union Standard's and HRC's *Daubert* Motions.

     A.     Joseph J. Launie, Ph.D., CPU+CU, FACFE.

HRC asks the Court to prohibit Dr. Launie from testifying at trial because, among other things, the testimony will not assist the trier of fact.  The Tenth Circuit has explained, "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute."  *United States v. Fredette*, 315 F.3d 1235 (10th Cir. 2003); *see also Corneveaux v. CUNA Mut. Ins. Group*, 76 F.3d 1498, 1504 (10th Cir. 1996). HRC maintains that Dr. Launie's testimony seeks to tell the trier of fact the meaning of the language of a policy that is in "plain English" and "consists of a few simple sentences."

The policy language at issue involves interpretation of terms such as "covered auto," "non-owned auto," "hired auto," "mobile equipment," "use," and "resulting from."  Such terms are not complex or technical terms that require an expert to testify as to their meaning. Accordingly, the Court grants HRC's motion and prohibits Dr. Launie from testifying at trial about the meaning of these terms or the other topics raised in HRC's motion.  *Cf. Thompson v. State Farm Fire & Cas. Co.*, 34 F.3d 932, 941 (10th Cir. 1994) (when expert testimony is offered to explain a question the jury is capable of assessing for itself, the trial court may exclude the testimony because it would not assist the trier of fact).

Because the Court grants HRC's motion on the ground that Dr. Launie's testimony will not assist the trier of fact, the Court need not consider HRC's other argument that the testimony

-44-

is not reliable.  The Court does note, however, that to the extent Dr. Launie's testimony

constitutes legal conclusions, such testimony would not be admissible at trial.  Accordingly,

testimony to the effect that HRC is not covered by the Union Standard policy, that the allegations

of the underlying complaint do not trigger coverage, or that the Nolan Brunson vehicle is not a

covered auto, would be inadmissible under Rule 702 as improper legal conclusions.

      B.    <u>Garth H. Allen</u>.

Union Standard asks this Court to preclude Mr. Allen from testifying at trial on the

ground that Mr. Allen's proposed testimony constitutes legal opinions.  Although the Court

agrees that the vast majority of the proposed testimony identified by Union Standard constitutes

improper legal conclusions, and grants the motion on this ground,[9] the Court also grants the

motion on the ground that expert testimony is not necessary in this case to interpret the clear and

simple terms of the Union Standard policy.  *See supra* § III.A.

## CONCLUSION

For the foregoing reasons, **IT THEREFORE IS ORDERED** that:

(1)    Defendant Hobbs Rental Corporation's Motion for Summary Judgment, filed

      December 29, 2005 **[Doc. No. 173]**, is hereby **GRANTED IN PART** as follows:

      (a)    HRC's motion seeking a judgment as a matter of law that the Nolan

            Brunson vehicle is a "non-owned auto" is granted;

---

[9] A few examples of the conclusory nature of Mr. Allen's testimony are:  (1) testimony that the Brunson vehicle was included within the definition of "covered auto," (2) testimony that the injuries arose out of the "use" of the vehicle, and (3) testimony that New Mexico has adopted the "some causation test," or that under either the "some causation" or "efficient and predominate" causes tests HRC is entitled to coverage.

(b)    HRC's motion seeking a judgment as a matter of law that the Nolan Brunson vehicle is a "hired auto" is denied;

(c)    HRC's motion seeking a judgment as a matter of law that the Nolan Brunson vehicle is not "mobile equipment" is denied;

(d)    HRC's motion seeking a judgment as a matter of law that the injury "resulted from" the use of the Nolan Brunson vehicle is granted;

(e)    HRC's motion seeking a judgment as a matter of law that Union Standard has waived its right to contest coverage is denied; and

(f)    HRC's motion seeking a judgment as a matter of law that it is entitled to reimbursement of its defense costs expended in the underlying litigation is denied.

(2)    Plaintiff Union Standard Insurance Company's Motion for Summary Judgment, filed January 13, 2006 **[Doc. No. 181]**, is hereby **DENIED** as follows:

(a)    Union Standard's motion seeking a judgment as a matter of law that the Nolan Brunson vehicle is not a "non-owned auto" is denied;

(b)    Union Standard's motion seeking a judgment as a matter of law that the Nolan Brunson vehicle is not a "hired auto" is denied;

(c)    Union Standard's motion seeking a judgment as a matter of law that the Nolan Brunson vehicle is "mobile equipment" is denied;

(d)    Union Standard's motion seeking a judgment as a matter of law that the injury did not arise out of the "use" of the Nolan Brunson vehicle is denied;

(e)     Union Standard's motion seeking a judgment as a matter of law that the injury did not "result from" the use of the Nolan Brunson vehicle is denied;

(f)     Union Standard's motion seeking a judgment as a matter of law that Union Standard does not have a duty to defend or indemnify HRC because the allegations and facts in the underlying action implicate coverage under the Reliance CGL policy is denied; and

(g)     Union Standard's motion seeking a judgment as a matter of law that it is entitled to reimbursement of its defense costs expending in the underlying litigation and in defense of HRC's bad faith claim is denied.

(3)     Plaintiff Union Standard's Motion for Summary Judgment Against St. Paul Guardian Insurance Company, filed January 13, 2006 **[Doc. No. 183]**, is hereby **DENIED** as moot.

(4)     Defendant HRC's Motion for Order to Prohibit the Testimony of Joseph J. Launie, PhD, CPCU, FACFE based upon *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, filed December 30, 2005 **[Doc. No. 176]**, is hereby **GRANTED**.

(5)     Plaintiff Union Standard's Motion to Strike Testimony of Garth H. Allen, filed January 13, 2006 **[Doc. No. 182]**, is hereby **GRANTED**.

Dated this 12th day of October 2006.

JUDITH C. HERRERA
UNITED STATES DISTRICT JUDGE